# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-1890

_____

United States of America,

        Appellee,

v.

Joseph Dominic Marcel Maltais,

        Appellant.

\*
\*
\*
\*  Appeal from the United States
\*  District Court for the
\*  District of North Dakota.
\*
\*
\*

_____

Submitted: December 13, 2004
Filed: April 7, 2005

_____

Before WOLLMAN, LAY, and COLLOTON, Circuit Judges.

_____

COLLOTON, Circuit Judge.

Joseph Dominic Marcel Maltais appeals the district court's[1] denial of his motion to suppress evidence seized during a search of his truck and trailer. *See United States v. Maltais*, 295 F. Supp. 2d 1077 (D.N.D. 2003). Maltais entered a conditional plea of guilty to possession with intent to distribute 50 kilograms or more

_____

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

of marijuana in violation of 21 U.S.C. §§ 841(a)(1) & 841(b)(1)(C), and was sentenced to a term of 30 months' imprisonment.  We affirm.

I.

Senior Border Patrol Agent Robert Danley, performing border patrol duties in a marked border patrol vehicle, encountered Maltais approximately 500 yards south of the Canadian border in rural North Dakota at approximately 1:00 a.m. on August 8, 2003.  Maltais was sitting in the driver's seat of his truck, which was parked facing south by the side of a gravel road.  The truck was towing a camper trailer, and both vehicles displayed Manitoba license plates.  Prior to this encounter, Danley knew that a local farmer had reported seeing a truck and trailer of similar description driving in the area in the early morning hours.

Agent Danley stopped and requested license checks on the truck and trailer. Shortly thereafter, Maltais approached Danley's vehicle and asked whether there was as problem.  The parties agree that Danley inquired about Maltais's immigration status and his most recent entry to the United States, but there is a dispute about precisely what was said.  295 F. Supp. 2d at 1081-82.  All agree that Danley did not believe Maltais's statements about his recent travels, and that the encounter ended when Danley told Maltais to return to his trailer and stay there.[2]

---

[2]Although the district court's opinion is not entirely clear about which testimony it credited concerning the initial interaction between Danley and Maltais, it is evident that the court believed at least a good portion of Danley's version, because it relied upon Danley's testimony in reaching its legal conclusion. Specifically, the district court relied on Danley's testimony that Maltais said he had traveled to the location over a route that Danley knew did not exist, and that Maltais was found approximately six miles from a paved road.  295 F. Supp. 2d at 1087-88. Danley testified that Maltais claimed to have backed into his location from a paved road.  *Id*. at 1081.

During this time, Senior Patrol Agent Bernard Olson heard the radio traffic and recognized the license plate numbers called in by Danley. Olson contacted Danley by radio and informed him that Maltais's vehicle was suspected of involvement in contraband smuggling. When Maltais's vehicle and trailer had undergone inspection at the Dunseith, North Dakota, Port of Entry around June 10, 2003, inspectors discovered hidden compartments in the floorboards of the trailer. Olson knew of the discovery and knew that Maltais's vehicle and trailer matched the description of the suspected smuggling vehicle. Olson asked Danley to detain Maltais until he could get there to pursue the investigation further. Danley then approached Maltais and instructed him to step out of the truck. Danley frisked Maltais and placed him in the back of the Border Patrol vehicle.

Olson contacted Special Agent Chris Guyer in Minot to let him know that Danley had stopped Maltais with the truck and trailer. As a result of previous intelligence reports and investigations, Guyer suspected that Maltais was a member of an international drug-smuggling group called the "Tetz Organization," which the Royal Canadian Mounted Police and the Canada Customs and Revenue Agency believed to be smuggling marijuana and currency into North Dakota from Manitoba. Guyer also knew that Maltais had been stopped at the Dunseith port of entry on June 10 with the same vehicles observed by Danley.

Olson was approximately 100 miles from the scene when he first spoke to Danley. At approximately 1:30 a.m., Olson contacted Bureau of Indian Affairs Officer Stacy LaRocque seeking canine assistance at Danley's location. LaRocque went to the police station, spoke with the K-9 handler, Officer Robert Hulett, and arranged to bring Hulett and a dog to the scene. LaRocque and Hulett obtained approval from the lead officer to provide such assistance at approximately 2:00 a.m.. They drove to the scene from Belcourt, North Dakota, which was over sixty miles from Danley's location.

Between 2:40 and 3:10 a.m., Guyer, Olson, LaRocque, and Hulett arrived at the scene. Olson identified Maltais as the same individual he had encountered during the inspection of the truck trailer at the Dunseith Port of Entry. At approximately 3:15 a.m., Olson asked Maltais for consent to search the truck and trailer. Maltais declined.[3]

Around 3:30 a.m. to 3:35 a.m., Hulett's drug-detecting dog swept the truck and trailer. The dog alerted to contraband at the rear of the trailer and twice near the trailer's side door. At this point, officers conducted a quick protective search of the trailer and saw several open black duffel bags containing plastic vacuum-sealed bags filled with a green leafy substance that appeared to be marijuana. Danley read Maltais his *Miranda* rights at approximately 3:55 a.m. Shortly thereafter, Maltais and the vehicles were taken to the Bottineau Border Patrol Station.

Later that day, Border Patrol agents executed a federal search warrant on the truck and the trailer. The search revealed three hidden compartments in the floorboards, which contained vacuum-sealed bags filled with marijuana. In total, 225.7 pounds of marijuana were seized. 295 F. Supp. 2d at 1083.

---

[3]After arriving at the scene, according to testimony about which the district court made no findings, the officers searched the area around the truck, in part because Olson was concerned that Maltais's companion from his earlier border crossing was not yet accounted for and could pose a threat. (Tr. 171). Agents Olson and Guyer then briefed all present on the situation, including the information they possessed regarding Maltais and the smuggling operation in which he was suspected of participating. (Tr. 172, 199-200). Olson and the other agents also contacted local law enforcement officials in an attempt to ascertain the proper local procedures and authority to conduct a dog sniff. (Tr. 126-27). In response to LaRocque's request, the officers then repositioned their vehicles to light the truck and camper more brightly. (Tr. 172-73).

Maltais was charged with one count of possession with intent to distribute a controlled substance. The district court denied his motion to suppress, concluding that the agents had reasonable suspicion to detain Maltais pending further investigation, and that the scope and duration of the detention did not violate the Fourth Amendment. The court remarked that "[i]t would have been extremely poor police work and incompetence to have done nothing and to have failed to take any steps to detain Maltais to further investigate the matter." 295 F. Supp. 2d at 1089. Maltais entered a conditional plea of guilty, and this appeal followed.

II.

Maltais first argues that he and his vehicles were seized in violation of the Fourth Amendment because the officers did not have sufficient grounds to justify his detention before they located the marijuana. It is well established, of course, that a law enforcement officer may detain a person for investigation without probable cause to arrest if the officer "has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994). The district court's determination that "reasonable suspicion" existed is a matter that we review de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

Maltais correctly observes that general assertions of suspicion are not sufficient to justify detention. For example, "[a] report that a particular car is 'suspicious' simply does not indicate whether its occupants may be engaged in criminal activity." *Thompson v. Reuting*, 968 F.2d 756, 760 (8th Cir. 1992). Maltais asserts that because the various behaviors that aroused Danley's suspicion were innocent, and because some of the intelligence upon which Danley relied was not based on Danley's

-5-

personal observations, there was no reasonable suspicion of wrongdoing based on articulable facts at the time of the investigative detention.

We disagree with Maltais that a reasonable suspicion may not be based in whole or in part on hearsay information. The Supreme Court long ago rejected the contention that reasonable cause for a temporary detention "can only be based on the officer's personal observations, rather than on information supplied by another person." *Adams v. Williams*, 407 U.S. 143, 147 (1972). In particular, "an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation to provide justification for a stop." *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir. 2003).

After reviewing Danley's encounter with Maltais, including the information that Danley received from fellow officers, the district court concluded that:

> Agent Danley had far more than just a citizen's report of a "suspicious vehicle." Even before Maltais approached Agent Danley during the early morning hours on August 8, 2003, in remote northern North Dakota, Agent Danley specifically knew that (1) a truck and trailer matching the vehicles at the side of the road had gone through an inspection at the Dunseith, North Dakota, Port of Entry on June 10, 2003; (2) the Bureau of Customs and Border Protection Inspectors found several hidden compartments in Maltais' trailer commonly associated with drug trafficking operations; (3) a truck and trailer matching this description were reported by a local farmer to be driving in this area in the early morning hours; (4) Agent Danley had been provided with background information concerning Maltais and the suspected drug ring originating in Canada or on the west coast; (5) roads in this area cross the United States and Canadian border where there are no designated ports of entry and these roads can be easily driven by almost any vehicle; (6) the truck and trailer had Canadian license plates; and (7) the location was within 500 yards of the United States and Canadian border.

295 F. Supp. 2d at 1086. We agree with the district court that based on this "constellation of facts," any law enforcement officer "would have reasonably concluded that Maltais may have been up to no good," and that the agents had "an articulable, reasonable suspicion that Maltais was likely engaged in criminal activity." *Id.*

We think *United States v. Beck*, 140 F.3d 1129 (8th Cir. 1998), upon which Maltais relies, is plainly distinguishable. In *Beck*, our court said "it is impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation." *Id.* at 1137 (internal quotations omitted). *Beck* rejected the government's argument that reasonable suspicion existed to detain the driver of an automobile after a routine traffic stop, where the officer observed only that the driver was operating a rental car from California (a "drug source state"), there were fast food wrappers on the floor of the car, there was no visible luggage, and the driver was nervous. *Id.* at 1132.

Maltais, by contrast, was not involved in a routine traffic stop. His vehicle was parked in a remote location close to the Canadian border in the dead of night. Even assuming that such behavior is innocent, the agents had concrete reasons for suspicion. *See United States v. Chhunn*, 11 F.3d 107, 110 (8th Cir. 1993) ("To decide whether the police met the reasonable-suspicion standard, we look to all the circumstances and the collective knowledge of the officers involved in the stop."). They knew that the vehicle had hidden compartments, that such compartments were frequently used in drug trafficking, that intelligence information suggested Maltais was involved in a drug smuggling ring, that drug smugglers operated in the area, and that vehicles of similar description had been sighted in the area earlier that night. "In forming a basis for suspicion, officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them.'" *Ortiz-Monroy*, 332 F.3d at 529 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Danley and his colleagues properly took

some facts which might individually be innocent and viewed them in context and in light of experience to find that the totality of the circumstances gave rise to a reasonable suspicion. *See Sokolow*, 490 U.S. at 9 (holding that although any one of several factors was "not by itself proof of any illegal conduct" and was "quite consistent with innocent travel," taken together they amounted to reasonable suspicion.); *United States v. White*, 42 F.3d 457, 460 (8th Cir. 1994) ("Although there is a possible innocent explanation for each of the factors, as a totality they created a reasonable suspicion justifying further investigation reasonable in scope.").

## III.

Maltais also argues that even if the initial stop was lawful, he was unreasonably detained and subject to a *de facto* arrest when he was held for almost three hours before arrest, including at least 90 minutes in Danley's patrol car. An investigative detention may turn into an arrest if it "lasts for an unreasonably long time or if officers use unreasonable force." *United States v. Navarrette-Barron*, 192 F.3d 786, 790 (8th Cir. 1999). During an investigative stop, officers should "employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose" of the temporary seizure. *Id.* The means used to effect the seizure must be objectively reasonable in light of the facts and circumstances confronting the officers. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989).

We do not believe the manner of detention – seating Maltais in Danley's patrol vehicle – was objectively unreasonable under the circumstances. Danley's reasonable suspicion gave him authority to detain Maltais while he verified or dispelled his suspicion. *See United States v. Dickson*, 58 F.3d 1258, 1263 (8th Cir. 1995). During the course of conducting his investigation, Danley was authorized to "take such steps as were reasonably necessary to protect [his] personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235

(1985).  Danley had reasonable grounds to suspect that Maltais was a member of a drug smuggling ring, which made him potentially dangerous, and the Canadian border was a short jog away, making flight a distinct possibility.  The two men were alone in a remote area in the middle of the night.  Under those circumstances, it was objectively reasonable for Danley to detain Maltais in his patrol car until assistance arrived, at which time he could complete his initial investigation and determine whether a formal arrest was warranted.[4]

Maltais argues that the length of the detention was unreasonable and exceeded the permissible scope of a *Terry* stop.  A detention may become a *de facto* arrest if it lasts for an unreasonably long time, but there is no rigid time limit on an investigatory detention.  *United States v. Sharpe*, 470 U.S. 675, 685 (1985).  In determining whether a period of time is excessive, we must consider the "law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *Id.*

---

[4]Maltais also asserts that he suffered humiliation when Danley would not permit him to exit the patrol vehicle for 40 minutes after Maltais announced that he needed to urinate. *See United States v. Lego*, 855 F.2d 542, 545 (8th Cir. 1988) (stating that in addition to length of detention, "an individual's privacy interest is also measured by the degree of fear and humiliation that the police conduct engenders"). The district court made no findings on this point, and the officers testified that as soon as a second agent arrived on the scene, Maltais was given several opportunities to urinate, but did not relieve himself on any of those occasions. (Tr. 38, 121-22, 125, 170).  We have reviewed Maltais's affidavit submitted to the district court, and there is no allegation that he suffered real pain or serious discomfort while waiting for an opportunity to urinate. *Cf. Muehler v. Mena*, 2005 WL 645221, at *6 (U.S. Mar. 22, 2005) (Kennedy, J., concurring).  We deem it unnecessary to remand for additional findings regarding Maltais's credibility, because even accepting his assertion that he was not permitted to leave the patrol car to urinate when he wished to do so, we believe that Danley's actions were reasonably related to the need for officer safety and prevention of flight while unassisted at a remote location in the middle of the night.

We have held that a one-hour detention upon reasonable suspicion to wait for a drug dog was reasonable. *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc). In *Bloomfield*, we explained that

> [w]hen police need the assistance of a drug dog in roadside *Terry* stops, it will in general take time to obtain one; local government police forces and the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times. Courts must consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.

*Id.* (internal quotation omitted). In *White*, we similarly held that it was reasonable for an officer to detain a truck for an hour and twenty minutes while awaiting the arrival of a drug dog. We observed that the officer acted diligently to obtain the dog and that the delay was caused only by the remote location of the closest available dog. 42 F.3d at 460. *Cf. United States v. Montoya de Hernandez*, 473 U.S. 531, 542-44 (1985) (16-hour investigative detention of suspected "alimentary canal" drug smuggler at international border was not unreasonable).

Here, the district court found that Danley detained Maltais in the back of his patrol car for somewhere between 90 minutes and two hours, and that Maltais was detained for approximately two hours and 55 minutes before he was finally arrested. 295 F.Supp.2d at 1089. In finding that this detention was reasonable, the district court emphasized the circumstances: "*It is of critical importance to note the time and the location where Maltais was found. This was in a very remote and isolated rural area in northern North Dakota, just 500 yards from the Canadian border, at approximately 1:00 a.m. in the morning.*" *Id.* at 1090 (emphasis in original). The difficulty in obtaining a drug dog, discussed in *Bloomfield*, was particularly acute under these circumstances.

"In assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation." *Sharpe*, 470 U.S. at 685 (quoting *United States v. Place*, 462 U.S. 696, 709 (1983)). The district court's factual finding on that point clearly supports the reasonableness of the action by law enforcement: "There is no evidence that any of the law enforcement officers were dilatory in their investigation or that there was any unnecessary delay." 295 F. Supp. 2d at 1090. While Danley "maintained the status quo and stabilized the situation until additional officers and a drug dog could arrive at the scene," *id.* at 1089, Olson rushed to the remote location from 100 miles away. Olson contacted numerous other law enforcement officers while en route; his communication included a request to LaRocque for the assistance of a drug detecting dog. *Id.* at 1090. The length of time required to mobilize law enforcement support and bring it to the scene was attributable to the early morning hour and the remote location of Maltais and his vehicles.

While a detention of this length would be unreasonable under different circumstances,[5] the unusual situation here made it impractical for the law enforcement agents to respond any sooner than they did. The officers acted with diligence and pursued the quickest and least intrusive means of investigation reasonably available to confirm or dispel their well-founded suspicions that Maltais was engaged in drug trafficking. "The Fourth Amendment does not require a policeman who lacks the

---

[5]*See, e.g.*, *Place*, 462 U.S. at 709-10 (90-minute detention of suitcase unreasonable where officers could have taken steps in advance to minimize the length of the delay); *United States v. Codd*, 956 F.2d 1109, 1111 (11th Cir. 1992) (two and a half-hour detention of suspect who was taken to a police station and had her purse searched without probable cause was unreasonable); *United States v. Scales*, 903 F.2d 765, 769 (10th Cir. 1990) (seven-hour seizure of suitcase unreasonable, especially given that officers did not make every effort to minimize the length of the delay); *United States v. Cagle*, 849 F.2d 924, 927 (5th Cir. 1988) (90-minute detention of suitcase unreasonable where it interfered with owner's travel plans and officers did not employ the most diligent and least intrusive investigatory techniques).

-11-

precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape." *Adams*, 407 U.S. at 145. To hold Agent Danley's actions unconstitutional would require law enforcement officials, at considerable public expense, to maintain specialized personnel and equipment at remote locations at all hours of the day and night, or to forgo the timely investigation of serious offenses as to which they have reasonable, articulable suspicion based on alert and cooperative police work. We do not believe the constitutional prohibition of "unreasonable" seizures dictates such a result. We therefore hold that the length of detention was reasonable under the circumstances, and that Maltais was not subjected to an arrest without probable cause.

The judgment of the district court is affirmed.

_____