# United States Court of Appeals
### For the Eighth Circuit

_____

No. 17-3046

_____

United States of America

*Plaintiff - Appellee*

v.

Antrell Desharron Lewis

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque

_____

Submitted: June 15, 2018
Filed: July 13, 2018

_____

Before LOKEN, GRUENDER, and ERICKSON, Circuit Judges.

_____

ERICKSON, Circuit Judge.

Following a three-day bench trial, the district court[1] found Antrell Desharron Lewis guilty of one count of conspiracy to distribute a mixture or substance containing heroin and furanylfentanyl resulting in death and serious bodily injury, in

---

[1]The Honorable Leonard T. Strand, Chief Judge, United States District Court for the Northern District of Iowa.

violation of 21 U.S.C. §§ 813, 841(a)(1), 841(b)(1)(C), and 846; and one count of distribution of a mixture or substance containing heroin and furanylfentanyl resulting in death and serious bodily injury, in violation of 21 U.S.C. §§ 813, 841(a)(1), and 841(b)(1)(C). The court sentenced Lewis to concurrent terms of 252 months' imprisonment to be followed by concurrent three-year terms of supervised release.

On appeal, Lewis argues the evidence was insufficient to support the convictions because (1) other individuals might have distributed the heroin laced with furanylfentanyl that caused the death and/or serious bodily injuries; (2) the government failed to establish "but-for" causation due to the intervening act of redistribution by another individual; (3) no conspiracy existed between Lewis and the individual who distributed the drugs to the victims; and (4) the government failed to prove Lewis knowingly distributed an analogue of a controlled substance. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.      Background

Joshua Manning testified that for about two months prior to March 2, 2016, he had been obtaining heroin from Lewis in Dubuque, Iowa. Manning usually conducted a couple of transactions with Lewis each week involving half gram or gram quantities. He was sometimes joined by his friend Jeremy Nadermann on these trips to Dubuque.

According to Manning's testimony, on March 2, 2016, he contacted Lewis about obtaining five grams of heroin on a "front."[2] Manning asked Nadermann to go

---

[2] A "front" in the context of drug trafficking simply means payment for drugs is made at a later date, presumably after smaller portions are sold and the proceeds from the sales are collected.

with him because Manning did not have a vehicle. Manning intended to give one or two grams of heroin to Nadermann for letting him use a car to make the trip.

Nadermann and Manning joined by two other individuals, Michael Vanamburg and Anthony Kelly, drove to Dubuque for the purpose of obtaining heroin. Manning testified he gave Lewis $200 in proceeds from Manning's sale of previously-fronted heroin. Manning explained at trial that five grams was the largest quantity he had received from Lewis in a single transaction. Nadermann confirmed during his testimony that a meeting was arranged with Lewis on March 2, 2016, to obtain heroin. Nadermann added that there was some discussion about the four of them pooling their money together to obtain a larger amount of heroin, which they would then divide into portions. According to Manning, Lewis agreed to front five grams of heroin to him for $800.

After Manning received the heroin, Nadermann requested the group drive to Jeremy Stierman's residence in Dubuque. Manning testified that he and Nadermann went inside Stierman's apartment while Vanamburg and Kelly stayed in the car. Manning weighed out one or two grams of heroin for Nadermann and a "50 bag" (about 0.2 grams) for Vanamburg. Manning put the rest in a bag. After dividing the heroin into portions, Manning and Nadermann returned to the vehicle to get high. Manning gave Vanamburg the "50 bag." Manning used a spoon and water to prepare a liquid mixture and drew some of it into a syringe for his use, and then gave the spoon to Kelly so he could use what was left.

Manning testified that he believed the substance he received from Lewis on March 2, 2016, was more potent than what he usually received. He described feeling a more intense high. Nadermann testified that he used some of the heroin Manning received from Lewis that evening and experienced a "strong weird feeling" but did not lose consciousness. In a very short period of time after using the heroin inside the vehicle, Manning noticed that Kelly was unresponsive in the backseat. Manning and

Nadermann attempted to revive Kelly. When they were unsuccessful, Manning took his portion of heroin back to Stierman's apartment and called 911. During the emergency call, Nadermann advised Manning that Vanamburg, too, was unresponsive.

Before emergency responders arrived on scene, Manning testified that he saw Nadermann throw what Manning believed to be a syringe and Nadermann's portion of the heroin into a snowbank. Emergency responders, suspecting opiate overdoses, testified they administered Narcan and revived both Kelly and Vanamburg. Once alert, Kelly and Vanamburg were transported to the hospital in ambulances. Dr. Joshua Pruitt, an emergency room physician, the deputy medical examiner for Linn County, Iowa, and the chief medical examiner for Cedar County, Iowa, testified at trial. Dr. Pruitt testified that, upon review of the evidence, it was his opinion that Kelly was rendered unconscious because of an opiate overdose and that Kelly was at serious risk of death without medical intervention. Dr. Pruitt also testified that Vanamburg faced the same risks and that Vanamburg would not have been in that situation without the use of an opiate. Dr. Pruitt noted that Vanamburg had been prescribed Oxycodone, but discounted the possibility that Vanamburg's overdose was caused by the prescription medication, as he was using it as directed and the frequency dosage would not cause the effects Vanamburg experienced. Dr. Pruitt opined that Oxycodone was not the cause of Vanamburg's overdose.

During the search of the vehicle, law enforcement officers found a metal spoon containing some residue and a small cotton swab. The items were sent to the crime lab for testing. The lab report indicated the substance on the spoon was heroin and furanylfentanyl. In the rear passenger door pocket, officers found a small plastic baggie with a white rock substance. The lab report indicated the substance in the baggie contained a mixture of heroin and furanylfentanyl. The substance weighed 0.12 grams.

Manning admitted he provided false information to law enforcement about the details of Kelly's and Vanamburg's heroin usage because he did not want to go to jail. Manning and Nadermann were not arrested and were allowed to leave the scene. Manning testified that after they left, Nadermann went back to Stierman's apartment to get Manning's heroin as well as the heroin and syringe Nadermann had thrown in a snowbank. Nadermann denied that he went back to Stierman's apartment. Nadermann testified that he and Manning drove to the hospital to check on Vanamburg and Kelly, but upon arriving decided not to go inside. According to Nadermann, he then parted ways with Manning. Nadermann drove back to Maquoketa while Manning stayed in Dubuque at his mother's house.

Brian Koster, Stierman's co-worker, testified at trial. He testified that during the evening of March 2, 2016, he was at Stierman's apartment. Stierman told Koster that he intended to use drugs that night. Koster was not a drug user and did not see Stierman use drugs that night. Koster was present at Stierman's apartment when two men arrived, went to the kitchen with Stierman for about 15 minutes, and then left. Koster identified one of the men as Manning. Koster was also present when Manning returned to the apartment and announced one of his friends had stopped breathing in the car. Koster was concerned about getting into trouble for being in the presence of drugs, so he asked Stierman if drugs were inside the apartment. Stierman confirmed the presence of drugs. Koster told Stierman he should get rid of them. According to Koster, Stierman left the apartment and came back about one minute later. Koster and Stierman remained in the apartment while emergency responders and law enforcement officers addressed the situation outside. About an hour after law enforcement officers cleared the scene, Koster left Stierman's apartment and drove home.

In the early morning hours of March 3, 2016, Nadermann sent text messages to Stierman. Stierman did not respond to any of the messages. Koster talked on the phone to Stierman when Koster arrived home. He noticed Stierman's state of mind

was different and Stierman sounded intoxicated. At 2:44 a.m. on March 3, 2016, almost immediately after the telephone conversation ended, Stierman sent a text message to Koster that stated:

> So I just wanted to get my story straight again in case jerry asks . . . as far as cops go we're in the clear im just hoping jerry isn't suspicious and at least ill have you as an alibi . . . just like we talked about me and you were havin a few beers after work when some random dudes just knocked on my door . . . call me when you can.

Koster testified that "jerry" was Stierman's landlord and he was also Koster's landlord.

At 2:07 p.m. on March 3, Stierman's father arrived at Stierman's apartment to pick up Stierman and take him to work, as they worked at the same manufacturing company and Stierman's father often gave Stierman a ride to work. When Stierman did not come out, Stierman's father drove to work. He became concerned when he learned Stierman did not show up for work. He called Stierman's sister during his break around 7:00 p.m. She drove to Stierman's apartment and found Stierman dead inside his apartment.

Dubuque County Sheriff's Officer Adam Williams testified that a baggie containing a substance was found in a kitchen cabinet in Stierman's apartment and a small amount of white powder was found on the kitchen counter. A lab report identified the baggie contents as 0.14 grams of furanylfentanyl and heroin. The powder on the counter consisted of furanylfentanyl.

Manning testified that the only drugs in his possession on March 2-3, 2016, were those he had obtained from Lewis. Manning acknowledged that Nadermann had "a little bit" of heroin with him when Nadermann picked Manning up, but that the group had stopped during the trip and used Nadermann's heroin before meeting

Lewis. Manning testified that he received a call from Lewis a couple days later asking for the money for the heroin that had been fronted. Manning told Lewis that he did not have the money and never paid Lewis for the heroin.

Dr. Julia Goodin, Chief Medical Examiner for the State of Tennessee, who previously held the same position for the State of Iowa, performed an autopsy on Stierman. She offered her expert opinion at trial that furanylfentanyl was the cause of Stierman's death based on the toxicology report, her autopsy findings, and evidence gathered from Stierman's apartment. Because Stierman's urine was presumptively positive for opiates, Dr. Goodin could not rule out the possibility that another opiate was involved as well. Dr. Goodin testified at trial that it was her opinion that Stierman would not have died if he had not used furanylfentanyl.

## II.    Discussion

Lewis contends the evidence was insufficient to sustain the convictions. He raises several arguments, but his main argument focuses on whether the district court erred when it convicted him on the charged offenses because at most he was guilty of distributing heroin, for which the death/serious bodily injury sentencing enhancement found in 21 U.S.C. §841(b)(1)(C) would not apply. We consider each of Lewis's arguments in turn.

"We review the sufficiency of the evidence de novo, viewing evidence in the light most favorable to the government, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." United States v. Trejo, 831 F.3d 1090, 1093 (8th Cir. 2016) (quoting United States v. Washington, 318 F.3d 845, 852 (8th Cir. 2003)) (internal quotation omitted). "Reversal is appropriate only where a reasonable [fact finder] could not have found all the elements of the offense beyond a reasonable doubt." Id. at 1093–94 (quoting United States v. Armstrong, 253 F.3d 335, 336 (8th Cir. 2001)) (internal quotation omitted).

Lewis contends the evidence failed to establish a conspiracy between Manning and him because Manning had no intention of paying for the drugs. It is immaterial whether Manning repaid Lewis or intended to repay Lewis. "To convict a defendant of conspiracy to distribute drugs, the government must prove that there was an agreement to distribute drugs, that the defendant knew of the agreement, and that the defendant intentionally joined in the agreement." United States v. Chavez-Alvarez, 594 F.3d 1062, 1066 (8th Cir. 2010) (citing United States v. Benitez, 531 F.3d 711, 716 (8th Cir. 2008)). "An agreement to join a conspiracy need not be explicit and can be inferred from the facts of the case." United States v. Davis, 826 F.3d 1078, 1081 (8th Cir. 2016) (citing United States v. Slagg, 651 F.3d 832, 840 (8th Cir. 2011)).

There is overwhelming evidence in the record establishing that Lewis and Manning were engaged in a heroin trafficking conspiracy. Manning testified that he had been receiving heroin from Lewis for approximately two months. Manning paid Lewis $200 from a previously fronted drug transaction when he obtained the five grams of heroin that gave rise to the charges in this case. Overwhelming evidence established that Lewis distributed heroin to Manning on March 2, 2016. Lewis agreed to front the drugs to Manning in return for $800. The charged offense was a conspiracy to distribute drugs, not to sell them. There was sufficient evidence for the district court to conclude that Lewis knowingly and voluntarily joined a conspiracy to distribute heroin, and he shared a common purpose with Manning and others.

Lewis's identification of evidence that weighs against the verdicts and his claim that Manning provided "self-serving" testimony are arguments that go to the district court's credibility determinations and weight to be given the evidence. "[W]e will not disturb the district court's reasoned credibility determinations." United States v. Bowie, 618 F.3d 802, 814 (8th Cir. 2010).

The court next turns to the focal point of Lewis's appeal, whether the sentencing enhancement found in § 841(b)(1)(C) is sustainable on the record. Lewis contends that the government failed to prove whether it was the heroin, furanylfentanyl, or combination of heroin and furanylfentanyl that caused the overdoses and death. Expert testimony provided by medical professionals established beyond a reasonable doubt that Vanamburg and Kelly would not have overdosed "but-for" the use of furanylfentanyl and that Stierman would not have died "but-for" the use of furanylfentanyl.

The government was not required to prove that Lewis knowingly distributed an analogue of a controlled substance. We have repeatedly explained that "[a] defendant does 'not need to know the exact nature of the substance in [his] possession, only that it was a controlled substance of some kind.'" United States v. Anwar, 880 F.3d 958, 967 (8th Cir. 2018) (quoting United States v. Morales, 813 F.3d 1058, 1068 (8th Cir. 2016)). Section 841(b)(1)(C) is a sentencing enhancement, not a separate offense. To sustain a conviction under 21 U.S.C. § 841(a)(1) with a serious bodily injury or death enhancement under § 841(b)(1)(C), the government must prove: "(i) knowing or intentional distribution of [an illicit drug], . . . and (ii) [serious bodily injury or] death caused by ('resulting from') the use of that drug." Burrage v. United States, 571 U.S. 204, 210 (2014).

The Supreme Court explained that "where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of § 841(b)(1)(C) unless such use is a but-for cause of the death or injury." Id. at 218–19. Following Burrage, the statutory sentencing enhancement in § 841(b)(1)(C) may be proved in two ways: (1) "but-for" cause, or (2) independently sufficient cause.

There is sufficient evidence in this case to conclude that the government proved that Lewis knowingly and intentionally distributed an illicit drug and, under the facts of this case, use of that drug was an independently sufficient cause of the overdoses and death. Accord United States v. Allen, 716 F.App'x 447, 450–51 (6th Cir. 2017) (where victim was found with a "cocktail of drugs" in her system, the state medical examiner's testimony combined with the close proximity of a spoon containing fentanyl was sufficient for the jury to conclude that fentanyl was an independently sufficient cause of death). At a minimum, the evidence established that, without the incremental effect of furanylfentanyl in the heroin, Stierman would have lived and Kelly and Vanamburg would not have suffered serious bodily injury. The statutory requirements for the sentencing enhancement set forth in § 841(b)(1)(C) have been met.

Finally, Lewis argues that even if it was proven that he provided the heroin to Manning, who then supplied it to Vanamburg, Kelly, and Stierman, the redistribution constitutes an intervening cause of the injuries and death for which Lewis cannot be held responsible. Nothing in Burrage or the plain language of the statute limits responsibility to only the last person to distribute the drug before the harm occurs.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

_____

-10-