# United States Court of Appeals
### For the Eighth Circuit

_____

No. 18-3277
_____

United States of America

*Plaintiff - Appellee*

v.

Richard Leroy Parker

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Northern District of Iowa - Dubuque
_____

Submitted: September 26, 2019
Filed: April 5, 2021
_____

Before LOKEN, COLLOTON, and KOBES, Circuit Judges.
_____

KOBES, Circuit Judge.

Richard Leroy Parker was found guilty of distributing a controlled substance near a protected location resulting in death and of possession with intent to distribute a controlled substance near a protected location. He was sentenced to life in prison

on both counts. Parker argues that the district court[1] erred by: (1) denying his motion to suppress statements made to law enforcement; (2) not instructing the jury on a lesser-included offense; (3) denying his motion for a new trial; and (4) sentencing him to two concurrent life sentences. We find no error and affirm.

## I.

Shortly after midnight on April 17, 2017, Parker called 911 from a friend's apartment on Rhomberg Avenue to report that his girlfriend, E.M., was not breathing. Officers from the Dubuque Police Department arrived at the apartment, which was shared by Donte Richards and Ashley Ostrander, both known narcotics users.

As Officer Richard Walker interviewed Parker, Parker walked around the apartment, where other officers, Ostrander, Richards, and paramedics were either speaking, moving about, or caring for E.M. Parker would pause briefly to answer questions. Eventually, Officer Walker told Parker to "just kinda stay here." Parker stopped for a moment and then continued to roam throughout the apartment. Officer Walker asked him whether E.M. had drunk alcohol or used drugs. Parker replied that E.M. had been drinking and used cocaine. At this point, another officer asked Officer Walker and Parker to continue their conversation outside.

Outside, Officer Walker continued asking Parker about the events that led up to E.M.'s medical emergency and the 911 call. Officer Walker also asked whether Parker had used drugs that day, which Parker denied. As they spoke, Parker tried to reenter the apartment a few times, but each time Officer Walker asked him to remain outside, including when paramedics brought a stretcher through the apartment's back

---

[1]The Honorable Linda R. Reade, United States District Judge for the Northern District of Iowa, adopting in part and modifying in part the report and recommendations of the Honorable C.J. Williams, then-Chief United States Magistrate Judge for the Northern District of Iowa.

door. Eventually, Officer Walker was able to get Parker to stand inside a vestibule just outside the apartment door. Here, Officer Walker asked Parker about his own drug use and this time, Parker admitted to using drugs earlier that evening. He also told Officer Walker that he last saw E.M. alert roughly 30 minutes before he called 911. Following this conversation, Parker reentered the apartment and sat in the dining room. While Parker sat, officers learned that E.M. had died at the hospital.

Investigator David Randall arrived at the apartment around 2:45 a.m. and asked whether Parker, Ostrander, and Richards would voluntarily accompany him to the police station. He told them that they were not under arrest. Parker was the only one who agreed. Before asking any questions at the station, Investigator Randall again informed Parker that he was not under arrest and also advised him of his *Miranda* rights. Parker waived those rights and admitted that he and E.M. snorted something he believed was heroin. Later that morning, Parker was arrested for a parole violation and police executed a search warrant at the Rhomberg apartment. Officers recovered baggies containing four grams of heroin from a living room chair.

Parker was charged with one count of distributing a controlled substance near a protected location resulting in death (Count I) and with two counts of possession with intent to distribute a controlled substance near a school (Counts II and III). *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A), (b)(1)(C), 851, & 860(a).[2] At trial, testimony showed that Parker and E.M. went into a bedroom around 9 or 10 p.m. and snorted an unknown substance prior to falling asleep. Parker woke up to Richards knocking on the door around midnight. Parker then tried to wake E.M., but she was unresponsive. A state medical examiner testified that E.M's death was caused by a mixed drug toxicity involving cocaine, ethanol, and heroin. He explained that

---

[2]Before trial, the Government dismissed Count III of the indictment after the district court suppressed evidence found at Parker's residence because the search warrant application lacked probable cause.

-3-

cocaine and heroin were each present at potentially fatal levels and that E.M. had ingested the heroin shortly before her death because 6-monoacetylmorphine, a byproduct of heroin which breaks down rapidly, was found during her autopsy.

Parker was convicted on two counts. The Government sought to enhance Parker's sentence based on four prior felony drug offenses. At sentencing, the district court found that those convictions supported a mandatory life sentence on both counts. It also found that Parker's total base level offense was 47 but reduced it to 43 because that was the maximum offense level permitted by the Guidelines, and that his criminal history was category III. The court accepted the Guidelines recommendation and sentenced Parker to life imprisonment for Counts I and II. Parker timely appealed.

## II.

Parker claims the district court erred in denying his motion to suppress statements he made at the Rhomberg apartment and later at the police station. He makes two arguments about statements he made to Officer Walker at the apartment: First, he says that he was unlawfully seized during his conversation with Officer Walker. Alternatively, Parker contends that even if he was seized lawfully, he was functionally in custody during that conversation, and so Officer Walker had to provide him *Miranda* warnings. Because Officer Walker never provided the warnings, Parker says he was unlawfully interrogated. As to the statements Parker made at the police station, he argues that his waiver of his *Miranda* rights was involuntary.

## A.

Parker argues that the statements he made to Officer Walker must be suppressed because he was in custody and not provided a valid *Miranda* warning.

We review the district court's custody determination *de novo* and its fact findings for clear error. *United States v. Vinton*, 631 F.3d 476, 481 (8th Cir. 2011).

"The Fifth Amendment requires that *Miranda* warnings be given when a person is interrogated by law enforcement after being taken into custody." *United States v. Giboney*, 863 F.3d 1022, 1027 (8th Cir. 2017). The Government concedes Parker was interrogated, so we need only determine whether he was in custody. "The ultimate question in determining whether a person is in 'custody' for purposes of *Miranda* is whether there is a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *United States v. Williams*, 760 F.3d 811, 814 (8th Cir. 2014) (citation omitted). "To determine whether a suspect was in custody, we ask whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave or cause the agents to leave." *United States v. Laurita*, 821 F.3d 1020, 1024 (8th Cir. 2016) (citation omitted).

"[S]eizure is a necessary prerequisite to *Miranda*." *United States v. Newton*, 369 F.3d 659, 672 (2d Cir. 2004). Parker says that he was unlawfully seized after Officer Walker told him to "just kinda stay here" because compliance was mandatory. We disagree. "It is well settled that not all interactions between law enforcement and citizens amount to seizures under the Fourth Amendment." *United States v. Cook*, 842 F.3d 597, 600 (8th Cir. 2016). Consensual encounters between officers and citizens, for example, are not Fourth Amendment seizures. *United States v. Perez-Sosa*, 164 F.3d 1082, 1084 (8th Cir. 1998). But, "[a] consensual encounter becomes a seizure when a reasonable person in the same circumstances would not feel free to leave." *Id.*

Parker's initial interaction with officers was consensual. After waking up, he called 911 to report that E.M. needed medical assistance. Once paramedics and officers arrived, it is reasonable to expect that officers would talk to individuals at the

-5-

apartment. Parker resists this conclusion, arguing that Officer Walker seized him by telling him to "just kinda stay here." In making this argument, Parker implicitly concedes that his encounter was consensual before that request.

Because the encounter was initially consensual, our task is to examine the totality of the circumstances to determine whether and when Parker was seized or had his freedom of movement restrained to a degree associated with formal arrest. *See United States v. Garcia*, 888 F.3d 1004, 1009 (8th Cir. 2018); *Giboney*, 863 F.3d at 1027. We examine several-nonexhaustive factors to guide our inquiry, none of which is dispositive. *Id.* We consider whether the officers restricted Parker's freedom of movement, informed him that questioning was voluntary, or that he was free to leave. *See id.* We also consider whether officers engaged in strong arm tactics or deceptive strategies while questioning Parker, whether the apartment was police dominated, and whether Parker was placed under arrest after the questioning ended. *See id.*

Officer Walker and Parker's conversation occurred as Parker paced throughout the apartment while paramedics attended to E.M. and other officers spoke with Ostrander and Richards. We agree with the district court that Officer Walker spoke "casually and colloquially" with Parker and that his "tone was calm and friendly, conveying that his words were a request and not a command." D. Ct. Dkt. 170 at 6. Officer Walker's request that Parker "just kinda stay here" did not by itself constitute a seizure or a significant restraint on his movement because it was "spoken as a colloquialism to be understood by the reasonable person to mean something more on the order of 'be patient while we finish up here,' not 'you are being detained.'" *See United States v. Valle Cruz*, 452 F.3d 698, 706 (8th Cir. 2006).

Parker next claims that even if he was not seized inside the apartment, a seizure occurred outside when Officer Walker told him to "just wait here." Officer Walker and Parker continued their conversation outside at another officer's request. While outside, paramedics continued to assist E.M. and also brought a stretcher inside

through the back door. During this conversation, Parker moved toward the back door and each time, Officer Walker told him to remain outside. Viewed in context, Officer Walker telling Parker to wait outside was not a command indicating compliance was necessary; instead he was ensuring that neither he nor Parker got in the way of paramedics or other conversations inside. Parker ignores this larger context and focuses on Officer Walker's "order[] to just 'wait here' when he showed even the slightest sign of moving." Parker Br. 29. "The totality-of-the-circumstances test precludes this sort of divide-and-conquer analysis." *See United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016) (citation omitted). Officer Walker's statement to Parker outside would be understood by the reasonable person to mean "let's just stay here and out of the way" rather than an order indicating something akin to "you are being detained." *See Valle Cruz*, 452 F.3d at 706. And although Parker was never explicitly told the questioning was voluntary, his continued walking around the apartment shows he possessed virtually unrestrained freedom of movement during the questioning. By merely following Parker inside and saying they should wait outside, Officer Walker did not restrain Parker's "freedom of movement to the degree associated with formal arrest." *See Giboney*, 863 F.3d at 1028 (citation omitted).

Plus, none of the other factors suggest Parker's encounter had ripened into a seizure or custodial arrest. The officers' weapons were all holstered, none of Parker's personal property was retained, nor did he have any indication that he was the focus of a particular investigation. *See Garcia*, 888 F.3d at 1009. Even though the residence was police dominated as officers and paramedics responded to E.M., "we have refused to find custody in circumstances where the atmosphere was much more police dominated." *Giboney*, 863 F.3d at 1028 (finding a home was not police dominated during execution of a search warrant). Once Officer Walker's conversation with Parker concluded, he was not placed under arrest. He remained in the dining room until he voluntarily agreed to accompany Investigator Randall to the police station. Viewing the totality of the circumstances, we conclude Parker was neither seized nor had a restraint on his freedom of movement of the degree associated with formal arrest and therefore he was not "in custody."

Finally, Parker relies on *United States v. Maltais*, 403 F.3d 550 (8th Cir. 2006) to contend that even if he "was initially seized lawfully (or not seized at all), the length and manner of the continued detention rendered it unlawful." Parker Br. 29. Parker's reliance is misplaced. In *Maltais*, we observed that "[a] detention may become a *de facto* arrest if it lasts for an unreasonably long time." *Id.* at 556. Crucially, the defendant in *Maltais* had been seized following a *Terry* stop. *Id.* at 554–55. Parker was never seized and therefore there was no detention that could have been rendered unlawful due to its length.[3]

B.

In another attempt to suppress his statements, Parker says that even if he was not seized at the apartment, and even if he was not subject to a custodial interrogation requiring a *Miranda* warning before arriving at the police station, he did not voluntarily waive his *Miranda* rights before being interrogated by Investigator Randall.

A *Miranda* waiver must be made voluntarily, knowingly, and intelligently. *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008). The waiver must be voluntary in the sense that "it was the product of a free and deliberate choice rather

---

[3]Parker also argues that he could not have validly consented to accompanying Investigator Randall to the police department later that night. Parker Br. 30–31. He claims his consent was invalid because "any consent is invalid when Parker was already told he did not have a choice" by Officer Walker. Parker Br. 31 (citation omitted). Investigator Randall asked Parker, Ostrander, and Richards to accompany him to the station and also informed them that they were not under arrest. Ostrander and Richards declined, but Parker agreed. Regardless of Officer Walker's previous statement, the voluntary nature of Investigator Randall's request was clear.

than intimidation, coercion, or deception." *Vinton*, 631 F.3d at 483.[4] We look to the totality of the circumstances and we accept the district court's factual findings unless they were clearly erroneous. *Id.* at 483. We review the ultimate determination of voluntariness *de novo*. *Id.*

Parker and Officer Walker's conversation ended around 12:48 a.m. Parker then sat in the dining room until 2:45 a.m and during this time period, fell asleep. There is no suggestion that officers intimidated, coerced, or deceived Parker following his conversation with Officer Walker. To the contrary, once Investigator Randall arrived, he informed Parker that he was not under arrest. Investigator Randall then asked Parker if he would accompany him to the station and reiterated that Parker was not under arrest. Even if Parker's contention that Officer Walker demanded he provide a statement to Investigator Randall were accurate, Investigator Randall made it clear that Parker was not under arrest and was not required to accompany him to the station. From this, it is apparent that Parker went to the police station voluntarily and was not in custody, so a *Miranda* warning was unnecessary. But even if we assume that Parker was seized and in custody at the police station, it is clear from the totality of the circumstances that Parker voluntarily waived his *Miranda* rights.

### III.

Parker next contends that the district court abused its discretion by denying his request for a lesser-included-offense jury instruction of possession of heroin for Count II, in addition to distribution of heroin. We review the denial of a lesser-included offense instruction for abuse of discretion. *United States v. Santoyo-Torres*,

---

[4]In addition to being the product of free will, a suspect must waive their rights "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Vinton*, 631 F.3d at 483. Parker does not argue he was unaware of the right and the consequences of abandoning it, so we only address whether it was voluntarily waived. *See* Parker. Br. 36.

518 F.3d 620, 624 (8th Cir. 2008). "The defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *United States v. Ziesman*, 409 F.3d 941, 949 (8th Cir. 2005) (citation omitted).

Parker was entitled to a lesser-included instruction if he could show, among other things,[5] that there was some evidence justifying conviction of the lesser offense and the proof on the elements differentiating possession and distribution were sufficiently in dispute that he could be found guilty of possession but not distribution. *See id.* Parker was charged with possessing heroin with the intent to distribute it. *See* 21 U.S.C. § 841(a)(1). Although Parker concedes he possessed heroin, he claims he did not intend to distribute it because "[o]nce he realized what the substance was, he intended to return it to the source." Parker Br. 38. Because he did not intend to resell the heroin, Parker says the court erred by denying the simple possession instruction. *Id.*

We disagree. "Distribute" means "to deliver . . . a controlled substance," 21 U.S.C § 802(11), and "deliver" means "the actual, constructive or attempted transfer of a controlled substance," *id.* § 802(8); *see also United States v. King*, 567 F.2d 785, 790–91 (8th Cir. 1977). We have repeatedly held that "federal drug distribution charges do not require an exchange for value." *United States v. Bynum*, 669 F.3d 880, 887 (8th Cir. 2012); *see also United States v. Fregoso*, 60 F.3d 1314,

---

[5]"[A] defendant is entitled to a lesser-included-offense instruction when: (1) a proper request is made; (2) the elements of the lesser offense are identical to part of the elements of the greater offense; (3) there is some evidence which would justify conviction of a lesser offense; (4) the proof on the element or elements differentiating the two crimes is sufficiently in dispute that the jury may consistently find the defendant innocent of the greater and guilty of the lesser included offense; and (5) there is mutuality, i.e., a charge may be demanded by either the prosecution or defense." *Ziesman*, 409 F.3d at 949 (citation omitted). The third and fourth requirements are the only ones in dispute.

1325 (8th Cir. 1995). Thus, a defendant distributes a controlled substance anytime he gives it to a third party. *See Fregoso*, 60 F.3d at 1325 ("[Defendant] distributed cocaine within the meaning of the statute when he freely gave cocaine to [his co-conspirators] on numerous occasions *as well as when he sold . . .* some of what he had purchased.") (emphasis added). As just discussed, Parker admits he intended to return the heroin to the individual from whom he purchased it. The district court rightly observed there was no testimony Parker "intended to keep and possess the heroin for his personal use without ever transferring it to another person." D. Ct. Dkt. 151 at 6. The court did not abuse its discretion in denying Parker's request for the lesser-included possession instruction.

IV.

Parker also asks that we reverse the jury's verdicts for Counts I and II because the verdicts lacked sufficient evidence.[6] "We review sufficiency of the evidence *de novo*, viewing evidence in the light most favorable to the jury's verdict, resolving conflicts in the government's favor, and accepting all reasonable inferences that support the verdict." *United States v. Seals*, 915 F.3d 1203, 1205 (8th Cir. 2019) (internal quotation marks and citations omitted).

As to Count I, Parker contends we should overturn the jury's verdict because the Government failed to show that he intentionally distributed heroin to E.M. and also failed to show the heroin caused her death. "To sustain a conviction under

---

[6]Parker's challenge to the validity of his conviction under Count II fails for the same reasons the district court did not abuse its discretion when it declined a lesser-included-offense instruction to the jury. Parker once more contends that because he intended to return the heroin to an individual in Chicago, he did not intend to deliver it. As discussed above, Parker's testimony shows he intended to transfer the heroin to another person, so we conclude that there was sufficient evidence to support his conviction. *See Bynum*, 669 F.3d at 887; *Fregoso*, 60 F.3d 1325.

21 U.S.C. § 841(a)(1) with a serious bodily injury or death enhancement under § 841(b)(1)(C), the government must prove: (i) knowing or intentional distribution of heroin, and (ii) serious bodily injury or death caused by ('resulting from') the use of that drug." *United States v. Harris*, 966 F.3d 755, 761 (8th Cir. 2020) (quoting *United States v. Lewis*, 895 F.3d 1004, 1009 (8th Cir. 2018)).

First, Parker claims that E.M. took the heroin on her own, even after he advised against it. He says this shows that he did not intentionally transfer the drugs to her. But, he also testified that he possessed the heroin before E.M. snorted it, she did not steal it from him, he did not attempt to stop her, and that he snorted one of the four lines E.M. prepared. In addition, his parole officer testified that Parker told her E.M. "took the pill–or crushed it up *after he gave it to her*." 1/17/18 Tr. 430:24–25 (emphasis added). Though Parker later testified that his parole officer lied, it is not for us to decide whether he or his parole officer was more credible. *United States v. Reddest*, 512 F.3d 1067, 1070–71 (8th Cir. 2008) ("[C]redibility determinations and the weighing of conflicting evidence are committed to the jury . . . . [T]he jury's credibility determinations are virtually unreviewable on appeal.") (internal quotation marks omitted). Viewing the trial evidence in the light most favorable to the verdict, we find there was sufficient evidence for the jury to find Parker intentionally distributed the heroin to E.M. because Parker knew the substance was heroin, brought it to the Rhomberg apartment, discussed it with E.M., told his parole officer that he gave it to E.M., and ultimately snorted it alongside E.M.

Second, Parker claims that E.M.'s death resulted from mixed drug toxicity, not his heroin alone. "[T]he statutory sentencing enhancement in § 841(b)(1)(C) may be proved in two ways: (1) 'but-for' cause, or (2) independently sufficient cause." *Lewis*, 895 F.3d at 1010. At trial, Parker testified that he and E.M. had snorted heroin shortly before her death, and the jury also heard a recorded jailhouse telephone call between Parker and an unidentified individual. During that call, Parker stated E.M. took "a little bump of that right there, boom, that was it, next thing you know she laid

down, she was outta there." The jury also heard the medical examiner's testimony that heroin was present at a potentially fatal level and that E.M.'s blood contained 6-monoacetylmorphine(6-MAM), which is a byproduct of heroin that converts into morphine in roughly 30 minutes. 1/17/18 Tr. 391:9–21. The medical examiner then explained that finding 6-MAM in the blood "suggests that that person has used quite recently prior to death." *Id.* at 391:17–19. Although the medical examiner testified that E.M.'s cause of death was a mixed toxicity involving cocaine, ethanol, and heroin,[7] there was sufficient evidence for the jury to conclude that the heroin Parker gave E.M. was an independently sufficient cause of her death because she immediately lost consciousness after taking it, still had 6-MAM in her blood, and heroin was present at a fatal level. *See Lewis*, 895 F.3d at 1010; *Seals*, 915 F.3d at 1206; *United States v. Allen*, 716 F. App'x 447, 450–51 (6th Cir. 2017). Because there was sufficient evidence, we affirm Parker's convictions.

V.

The district court sentenced Parker to life in prison on both Counts I and II.[8] Parker argues that his concurrent life sentence for Count II is incorrect because: (1) the court should have sentenced him under the First Step Act; and (2) he does not have two qualifying felony drug offenses to support a mandatory life sentence.

Because Parker's convictions and his life sentence under Count I are valid, we decline to review his concurrent life sentence under Count II pursuant to the

---

[7]The medical examiner also testified that cocaine, cocaethylene (the combination of cocaine and ethanol), and heroin were each present at possibly fatal levels.

[8]Parker argues that his life sentence for Count I must be reversed because the Government failed to prove that his distribution of heroin caused E.M.'s death. Because we conclude that there was sufficient evidence at trial to support his conviction, we reject this claim.

-13-

concurrent sentence doctrine. *See Eason v. United States*, 912 F.3d 1122, 1123 (8th Cir. 2019) ("The concurrent sentence doctrine allows courts to decline to review the validity of a concurrent conviction or sentence when a ruling in the defendant's favor would not reduce the time he is required to serve or otherwise prejudice him in any way.") (citation omitted); *see also Oslund v. United States*, 944 F.3d 743, 746 (8th Cir. 2019).

The elements necessary to apply the concurrent sentence doctrine are present here: (1) Parker received concurrent life sentences on Count I and Count II of the indictment; (2) we have decided that his conviction and sentence under Count I are valid; and (3) a ruling in Parker's favor on Count II would not reduce the time he would serve under the valid life sentence on Count I. *See United States v. Smith*, 601 F.2d 972, 973 (8th Cir. 1979) (setting forth elements).

We acknowledge that the Supreme Court has explained that even a separate $50 assessment can preclude us from applying the concurrent sentence doctrine. *Ray v. United States*, 481 U.S. 736, 737 (1987) (per curiam). But here, unlike in *Ray*, we have already decided that Parker's conviction under Count II was valid. And while the district court imposed the $100 assessment required by 18 U.S.C. § 3013(a)(2)(a) under Count II, that assessment would apply regardless of his sentence because it is imposed on "any person convicted of" a federal felony. Because Parker was properly convicted on Count II and subject to the assessment regardless of his sentence, he is not prejudiced by our application of the doctrine.

## VI.

Parker's convictions and sentence are affirmed.

_____