NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 20-2841
_____

UNITED STATES OF AMERICA

v.

DAVID PIAQUADIO,
Appellant

_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal No. 4-15-cr-00249-001)
District Judge:  Honorable Christopher C. Conner

Submitted Under Third Circuit L.A.R. 34.1(a)
April 29, 2021

BEFORE:  PHIPPS, NYGAARD, and ROTH, *Circuit Judges*

(Filed: July 14, 2021)

_____

OPINION[*]
_____

NYGAARD, *Circuit Judge.*

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

Following a non-jury trial, the District Court convicted David Piaquadio on four counts of drug-related offenses.[1] He challenges the District Court's conclusion in Counts One and Four that the Fentanyl he distributed caused serious bodily injury, making him liable under the enhanced penalty provision of 21 U.S.C.A. § 841(b)(1)(C). He asserts there is no evidence of but-for causation. *See United States v. Gonzalez*, 905 F.3d 165, 189 (3d Cir. 2018). He adds that the victim did not suffer serious bodily injury because there is no evidence that the victim was ever at "substantial risk" of dying. 21 U.S.C.A. § 802(25)(A). We will affirm the judgment of conviction and sentence.

Our plenary review on the sufficiency of the evidence is "'highly deferential,'" focusing on the question of "'whether there is substantial evidence that, when viewed in the light most favorable to the government, would allow a rational trier of fact to convict.'" *United States v. Bornman*, 559 F.3d 150, 152 (3d Cir. 2009), *as amended* (Apr. 24, 2009), *as amended* (May 5, 2009) (quoting *United States v. Helbling*, 209 F.3d 226, 238 (3d Cir. 2000)). We review findings of "historical or narrative events" in non-jury criminal cases for clear error. *United States v. Delerme*, 457 F.2d 156, 160 (3d Cir.

---

[1] Piaquadio challenges his conviction on Count One (conspiracy to distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C.A. § 846) and Count Four (serious bodily injury resulting from use of controlled substances that Appellant distributed and possessed with intent to distribute in violation of 21 U.S.C.A. § 841(a)). Both counts require a mandatory minimum prison sentence of twenty years. *See* 21 U.S.C.A. § 841(b)(1)(C). The District Court sentenced Piaquadio to 20 years imprisonment on each of the four counts, served concurrently. It also imposed a supervised release term of three years on each count to be served concurrently and special assessments totaling $400.

1972). "We do not weigh evidence or determine the credibility of witnesses." *United States v. Gambone*, 314 F.3d 163, 170 (3d Cir. 2003).

Joshua Moroschok went to Piaquadio's house on March 12, 2015. He used a bag of heroin while there and agreed to run some errands for Piaquadio in exchange for three oxycodone pills. The District Court credited Moroschok's testimony that, after he returned, he asked Piaquadio for a Fentanyl patch and agreed to pay for it the next day. He went home after Piaquadio supplied him with the Fentanyl. The District Court also credited Moroschok's testimony that he placed one-quarter of the Fentanyl patch on a spoon, added citric acid, extracted the opiate by heating it over a flame, and injected it into his arm with a syringe. He remembered nothing else until he was in the ambulance. But testimony from others described what happened next.

Moroschok lived with his mother. She testified that, shortly after midnight, Moroschok's dog alerted her to a problem. She found her son on the floor of his room unconscious with a syringe stuck in his arm and a spoon nearby on the floor. He struggled to breathe. She called 911. The first to arrive on the scene was Chief of Police Christopher Brackman. He observed that Moroschok was unconscious on the floor with shallow breathing. He administered a sternum rub but Moroschok's condition did not change. Brackman testified that he saw a needle stuck in Moroschok's shirt sleeve, a burning candle nearby, and a spoon with some substance on it—identified by a laboratory as Fentanyl. Later he searched the room and found an item he associated with heroin use.

An Emergency Medical Technician, Douglas Parsell, arrived next. He observed Moroschok's shallow breathing and recorded his oxygen saturation as 75 percent. He

3

assessed Moroschok's low oxygen saturation as life-threatening and gave him six liters of oxygen in the ambulance. Parsell administered a sternum rub and got a response from Moroschok, who—at some point after that—told him that he had taken Fentanyl.

Donald DuVall, a paramedic, joined the ambulance en route to the hospital. DuVall observed that Moroschok's pupils were constricted, his speech was slurred, and his breathing was shallow, with an oxygen saturation of 83 percent. DuVall assessed that it was appropriate to administer intravenously one milligram of naloxone, a drug used to reverse the effects of an opiate overdose, to improve his breathing. Moroschok vomited and he became more alert. His oxygen saturation rose to 97 percent. Moroschok told DuVall he heated a patch of Fentanyl and injected it.

Perry Doan, D.O., who is board-certified in emergency medicine, treated Moroschok at the emergency room. He noted that his oxygen saturation was at 98 percent when he arrived. Dr. Doan testified that Moroschok told him he had heated a Fentanyl patch mixed with Mountain Dew and injected it. Moroschok also told him that he had used heroin and oxycodone. The hospital record showed that a portion of a patch (later identified by a laboratory as containing Fentanyl) and three pills (identified by a laboratory as oxycodone) were found on Moroschok during the examination. When asked, Moroschok affirmed that the pills were his. The hospital discharged Piaquadio about nine hours later.

Robert Julien, M.D., Ph.D., a specialist in anesthesiology and pharmacology was called by Piaquadio to testify. He reviewed the record and opined that Moroschok's condition on that evening was not life-threatening. He acknowledged that an oxygen

4

saturation level of 75 percent could pose a mortal threat but stated that it is not necessarily so. Pointing to his improvement with just oxygen Dr. Julien posited that Moroschok could have recovered on his own. And he noted the lack of laboratory results showing Fentanyl use. But on cross-examination Julien acknowledged that injecting the amount of Fentanyl contained in one-quarter of a patch has a high risk of being fatal. He also stated that the mother's initial call to 911 and the medical treatment Moroschok received after that were appropriate to the condition that he presented.

Dr. Doan observed that Moroschok's condition before arriving at the hospital—his shallow breathing and oxygen saturation of 75 percent—pointed to a strong risk of hypoperfusion. This is a condition in which the body's cells are not receiving sufficient oxygen. Doan testified that, without intervention, a person in this condition has a substantial risk of brain damage and death. He stated that Moroschok's shallow breath was consistent with how opioids affect the central nervous system; they suppress respiratory drive. He also noted that the treatment with naloxone worked.

Dr. Doan referenced the blood test and urinalyses that revealed marijuana and high levels of oxycodone and heroin. He also acknowledged that the hospital's urinalysis did not and cannot detect Fentanyl, and he explained that this opioid is typically not screened in tests that the emergency room physicians order from outside labs. But relying on Moroschok's reporting to him of Fentanyl use Doan testified that any dose of Fentanyl above 100 micrograms could pose a particularly grave threat compared to oxycodone or heroin since it is between 100 to 400 times more potent than either. Aware that a Fentanyl patch contains 7,200 micrograms, he opined that if Moroschok was injecting the

5

Fentanyl he extracted from even a small portion of the patch, this was a grave threat to his life. The record led Doan to conclude that Moroschok was at substantial risk of death before receiving treatment on that night.

After weighing the evidence, the District Court noted that physical evidence and testimony from multiple eyewitnesses on Moroschok's condition that night are consistent with Dr. Doan's opinion. It found Doan's opinion persuasive "that Moroschok was in grave danger of sustaining a mortal injury." *United States v. Piaquadio*, No. 4:15-CR-249, 2019 WL 3337063, at *4 (M.D. Pa. July 25, 2019). The District Court also found that his use of Fentanyl caused this grave danger and it ruled that this was a serious bodily injury under Section 841(b)(1)(C). *See United States v. Lewis*, 895 F.3d 1004, 1010 (8th Cir. 2018) (overdose posing significant risk of death was serious bodily injury).

Piaquadio contends the District Court made erroneous factual findings. He makes much of the difference in testimony between Moroschok and his mother about when he arrived home. Moroschok estimated the time was 7 PM. His mother could not give a specific time but recalled him getting in when they were going to bed. He says this weakens the reliability of Moroschok's account of his activity that night. Piaquadio next notes the mother said the syringe was in her son's arm, but Brackman said it was stuck in his shirt sleeve. Also, this syringe was never tested. Piaquadio questions whether any evidence shows that Moroschok injected Fentanyl that night. He adds that experts did not establish Fentanyl as the but-for cause of Moroschok's condition. Dr. Doan knew about the high levels of heroin and oxycodone, and Piaquadio highlights that he concluded only generally that an opioid overdose caused Moroschok's physical distress.

6

He says this—combined with Moroschok's heroin use that day, the lab results, and heroin-related items found in his room—create reasonable doubt that Fentanyl was the actual cause of harm here. Next, he points to Moroschok's quick recovery and his relatively short stay in the emergency room as evidence that he was not at substantial risk of death. Alternatively, to distance himself from any harm, Piaquadio highlights that Moroschok got the Fentanyl by heating the patch with a solvent. He says this is the but-for cause. All of this shows, he argues, that there is insufficient evidence for any rational trier of fact to conclude beyond reasonable doubt that he is liable under Section 841(b)(1)(C).

But the District Court credited Moroschok's statement that he had extracted Fentanyl from about one-quarter of a Fentanyl patch and injected it before losing consciousness. Dr. Doan indicated that Fentanyl is 100 to 400 times more potent than either heroin or oxycodone. And referring to Moroschok's statement, he testified that just injecting Fentanyl from even a small part of that patch would have placed Moroschok in grave danger.

Substantial evidence supports the District Court's findings that Moroschok injected Fentanyl from a patch that Piaquadio distributed to him, resulting in a medical emergency that posed a substantial risk of death. So, sufficient evidence exists here for a rational trier of fact to conclude beyond a reasonable doubt that Piaquadio's distribution of a Fentanyl patch to Moroschok was the actual cause of serious bodily injury. The District Court did not err by ruling that Piaquadio is guilty under the enhanced penalty provision of Section 841(b)(1)(C).

For all of these reasons, we will affirm the judgment of conviction and sentence.