# United States Court of Appeals
## For the Eighth Circuit

_____

No. 22-1561
_____

United States of America

*Plaintiff - Appellee*

v.

Gerald E. Cardwell, Jr.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 11, 2023
Filed: June 29, 2023

_____

Before SMITH, Chief Judge, WOLLMAN and LOKEN, Circuit Judges.

_____

SMITH, Chief Judge.

A jury found Gerald E. Cardwell, Jr. guilty of distributing a controlled substance resulting in the death of R.L., in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C), and 851. The district court[1] sentenced Cardwell to life imprisonment.

---

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

On appeal, Cardwell argues that (1) the evidence was insufficient to sustain his conviction, (2) the district court erred in allowing the government to introduce evidence of Cardwell's prior drug arrests and convictions pursuant to Federal Rule of Evidence 404(b), and (3) the district court's use of Cardwell's prior drug possession conviction to enhance his sentence is unconstitutional because it punishes Cardwell more harshly than a drug distributor. We affirm.

I. *Background*

Steve Newton, an opioid addict, purchased drugs from Cardwell, his dealer. In the summer of 2019, Newton communicated with Cardwell on a daily basis. Cardwell's name and phone number were stored in Newton's cell phone contact list. On the night of July 25, 2019, and into the early morning hours of July 26, 2019, Newton arranged via text messages and phone calls to meet Cardwell at the Hollywood Casino in St. Louis, Missouri. Newton planned to purchase one half-gram of fentanyl from Cardwell because Newton was "dope sick." R. Doc. 130, at 178.

R.L. was a college friend of Cardwell. On the night of July 25, 2019, R.L. made two withdrawals from an ATM inside a convenience store. R.L. withdrew a total of $500 at around 10:17 p.m. and 10:22 p.m. At the time, he was alone. At 11:09 p.m., Cardwell texted the following to R.L.: "Okay, Bro. I hope you are on your way. . . . [H]e's waiting on us." R. Doc. 134, at 22. The text message was sent from Cardwell's phone number to R.L.'s phone.

Shortly after midnight on July 26, 2019, Cardwell told Newton via text message that Cardwell "was on his way to the city," which meant that Cardwell "was going to pick up or purchase [f]entanyl." R. Doc. 130, at 183. Cardwell told Newton that he was "[w]ith his boy Ryan" (R.L.), *id.* at 93, who was "rich, rich, rich," *id.* at 185. He also told Newton that he was "driving a brand new 2019 or '20 Tahoe." *Id.* Newton asked Cardwell why he was driving the Tahoe, since he knew that it was not Cardwell's vehicle. Cardwell replied that he had given R.L. his "special mixing" of

fentanyl and Adderall. *Id.* at 188–89. Cardwell told Newton that "[R.L.] is TKO," indicating that R.L. was unconscious. *Id.* at 189. Cardwell later repeated that "his boy Ryan [was] . . . passed out in the passenger seat." *Id.* at 200.

Newton continued texting Cardwell about buying drugs from him. Cardwell informed Newton that "he had [gone] down to the city, just met [one of his drug suppliers], purchased what he was getting, and [was] . . . heading back." *Id.* at 194. Newton asked Cardwell if he was "going straight back to [the] Hollywood [Casino]," *id.* at 195–96, and whether Newton could "bring [Cardwell] an Adde[rall] or two," *id.* at 196, that night to make Cardwell "happy," *id.* at 197. Cardwell told Newton he would not be at the Hollywood Casino for more than "20 minutes" because he would have "to leave [R.L.] in the car." *Id.* at 201.

Following their text exchange, Newton met Cardwell at the Hollywood Casino garage to get his drugs. Cardwell, who was in the driver's seat of the Tahoe, entered the restricted VIP parking level of the garage at around 1:33 a.m. on July 26, 2019. Cardwell used his casino VIP player card to enter this restricted VIP garage. R.L. was asleep in the passenger seat of the Tahoe. Newton parked on a different level of the parking garage but located Cardwell and R.L. on the restricted parking level of the garage. Newton got into the back seat of the Tahoe. Cardwell was concerned about all of the cameras in the garage, so no one in the Tahoe consumed or exchanged drugs. Cardwell and Newton woke R.L. so that they could all go up to the hotel room, where Newton would get his drugs from Cardwell. Newton saw Cardwell put the drugs that Cardwell had obtained from his supplier in his pocket. Video surveillance captured the Tahoe entering the garage and parking in a space approximately 15 minutes before three men walked from the Tahoe towards the Casino. It also captured the same men walking into the casino hotel at approximately 1:48 a.m. At that time, R.L. struggled to walk, stumbled, and exhibited difficulty with his balance and coordination while walking through the casino. Video surveillance also captured the

three men taking an elevator to the seventh floor of the hotel, walking down a hallway, and entering Room 720, Cardwell's hotel room.

After entering Room 720, Cardwell removed the baggie of fentanyl capsules from his pocket. He gave three to five capsules of fentanyl and some methadone to Newton. Newton did not consume the drugs in the room. Additionally, Newton never saw Cardwell or R.L. consume drugs, nor did he see Cardwell give any drugs to R.L. in the room. Newton observed R.L. sitting on one of the beds in the room. Cardwell told R.L. that he could lay on the bed, and R.L. laid down. Newton stayed for approximately 10 minutes. Around 2:06 a.m., Newton left the hotel property and did not return.

The next morning, Cardwell was seen leaving Room 720 at approximately 10:00 a.m. carrying some bed linens. He placed the linens in a plastic bag on the floor, near some housekeeping carts. Cardwell went back into Room 720, reemerging about ten minutes later. In the hall, he stopped and spoke to Jasmine Ford, the lead Hollywood Casino housekeeping inspector. According to Ford, Cardwell was sweaty, in a hurry, and carrying bags. Cardwell asked Ford if his "buddy" could stay later and not be disturbed because he was sleeping. *Id.* at 101. Cardwell then left the hotel and met Tammy Davidson on the same restricted VIP parking level where the Tahoe was parked. Cardwell changed his shirt. Cardwell and Davidson then entered the casino property. Video surveillance captured Cardwell and Davidson leaving the casino property approximately an hour and 15 minutes later. At just after noon, Cardwell sent two text messages to R.L.'s phone.

Meanwhile, between 11:00 a.m. and 12:30 p.m., Ford, the housekeeping inspector, knocked on the door to Room 720 but received no answer. She opened the door with a master key and called out, "Housekeeping." *Id.* at 103. She still got no response. Before leaving the room, she saw someone's legs and feet on the bed. She presumed the person was sleeping and left.

-4-

At approximately 3:00 p.m. or 3:30 p.m., Ford returned to Room 720, knocked on the door, and again announced, "Housekeeping." *Id.* at 104. Again, no response. She entered the room using the master key and again called out, "Housekeeping." *Id.* at 105. Still, she received no response. She continued farther into the room and saw R.L. on the bed. His eyes were open and had a film over them. Ford "knew instantly something was wrong." *Id.* Ford left the room and immediately radioed security for help.

Jeffrey Mazanec, an EMT and security supervisor at the Hollywood Casino, responded to the radio call. When Mazanec entered the room, he could see a man on the bed. He called out, "Sir, can you hear me[?]" R. Doc. 129, at 173. He received no response. Mazanec checked for a pulse and signs of breathing, but there were neither. R.L.'s skin appeared to be pale. A white, foamy substance was around the corners of his mouth. He was cool to the touch and exhibited signs of rigor mortis. Mazanec directed the security dispatcher to call 911 and waited in the room until law enforcement arrived.

Paramedics arrived shortly thereafter. They found R.L. on the bed. One of the paramedics, Ben Oster, checked for signs of life. He was not breathing, had no pulse, and was cool to the touch on his limbs and core. Rigor mortis had already set in. According to Oster, all of these were "obvious signs of death for a prolonged time." *Id.* at 190. The paramedics did not perform any lifesaving measures but did attach leads to the patient to confirm that he had no heart activity. Oster also noticed secretions around the patient's nose and mouth. These secretions were from his lungs, which had filled up due to prolonged heart failure, lung failure, and inactivity. Oster was familiar with what an overdose death looks like, and he concluded that this "look[ed] like an overdose death." *Id.* at 196.

Sergeant Kendra House and Detective Nick Anthon of the Maryland Heights Police Department responded to the Hollywood Casino. They arrived at Room 720 around 4:00 p.m. House obtained a copy of the hotel registration record for Room 720 and learned that it had been registered to Cardwell. House observed the deceased man on the bed. The body was a bluish-purple color. He had a foam cone around his nose and mouth, characteristic of an opioid overdose. His body was cold and in full rigor mortis, which indicated to House that he had been dead for approximately eight to ten hours. Anthon searched the room and found a wallet with R.L.'s identification. There were credit cards in the wallet but no money. R.L.'s cell phone was found lying on the bed next to his body.

The officers looked for drug paraphernalia "because he immediately presented as someone who had overdosed," but they could not locate any. *Id.* at 212. "[T]he absence of drug paraphernalia in [the] room [was] significant," according to House, because it suggested "[t]hat someone else had cleaned up the room." *Id.* On the dresser, House found R.L.'s "wallet, . . . a couple of handwritten notes, and . . . a receipt from a cash withdrawal." *Id.* at 213. The first note stated, "Try to checkout by noon, 1:00 p.m. at th[e] latest, please, please, they get upset if it is pas[t] 1:00 p.m., thanks Bro, Gerry." *Id.* at 216. The second note stated, "[R.L.], call me when you wake up, Bro, I had to go home[.] . . . [Meeting] my daughter to do loan stuff for her first year at DMC, Gerry." *Id.* at 217. House also found vehicle keys in Room 720 and confirmed that R.L. owned a Tahoe. House located the Tahoe on the restricted VIP parking level.

By reviewing the Casino's records and surveillance video, House was able to develop a timeline of events and identify R.L. and Newton in the video. After identifying Newton, House and Anthon located him. Newton voluntarily agreed to an interview with the detectives. Newton showed the detectives text messages on his cell phone between himself and Cardwell. Newton permitted the detectives to photograph and preserve the messages. Newton also viewed a photo lineup of six individuals.

Newton identified Cardwell's photo from the lineup, writing on the top of the photo, "This is Gerald Cardwell." R. Doc. 130, at 52. He dated the photo and signed his name.

Newton told the detectives about a phone call that he hd received from Cardwell later in the day on July 26, 2019. Cardwell was at St. Joseph's Hospital and told Newton "that he needed to get out of there as soon as possible." *Id.* at 221. Cardwell explained that he had fallen asleep in the bathroom at the Ameristar Casino in St. Charles, Missouri, and had been taken to the hospital. He asked Newton for a ride home from the hospital.

House followed up on this information by contacting the Missouri State Highway Patrol Gaming Division. Sergeant Todd Barthelmass was assigned to the Ameristar Casino. On the afternoon of July 26, 2019, he received a call to respond to one of the restrooms in the Ameristar Casino at 4:16 p.m. Barthelmass found Cardwell semiconscious in a toilet stall inside the bathroom. He discovered a plastic baggie full of blue and clear capsules at Cardwell's feet. The capsules appeared to contain narcotics. The baggie was photographed, seized, and eventually turned over to House. A crime lab tested the 28 capsules in the baggie and identified them as containing fentanyl.

Newton also told the detectives that on July 27, 2019, he met with Cardwell at Kip Estes's home to purchase drugs from Cardwell. During the meeting, Cardwell told Newton that if anybody asked Newton whether there were any drugs at the Hollywood Casino on the previous night, Newton should say no. When Newton asked Cardwell why he was instructing him to say there were no drugs, Cardwell told Newton that R.L. had died.

Newton agreed to cooperate with law enforcement by purchasing drugs from Cardwell under controlled circumstances. While under police supervision, Newton texted Cardwell on July 31, 2019, about buying drugs from Cardwell. Newton was fitted with a recording device and met Cardwell at Estes's home, intending to purchase $80 worth of fentanyl using funds that the police provided. At Estes's home, Cardwell sold Newton 12 blue and clear capsules that matched those found on Cardwell at the Ameristar Casino. The crime lab subsequently confirmed that these capsules contained fentanyl.

Two weeks later, Newton agreed to conduct a second controlled buy of drugs from Cardwell. He once again texted Cardwell to arrange the buy. Newton obtained $40 from the police to purchase the drugs. He was again equipped with a recording device. Newton met with Cardwell at the home of Cardwell's parents. Cardwell got in Newton's car and gave Newton five capsules in exchange for $40. The crime lab subsequently confirmed that these capsules contained fentanyl.

Two months after R.L.'s death, Newton saw Cardwell outside of a convenience store. Cardwell was sitting in a minivan and gestured for Newton to come over to his vehicle. He told Newton to get in. Once Newton was inside, Cardwell told Newton that Newton "was the only person," *id.* at 247, that could cause "[a]ny trouble" for Cardwell, *id.* at 248. Cardwell stated, "You are the only person that would know there is two people in the room, me and [R.L.], and it is my word against his word, and he is no longer here . . . ." *Id.* Cardwell also told Newton that "he had a friend in Hazelwood that wouldn't have a problem putting a red dot on [Newton's] forehead," *id.*, which Newton interpreted to mean "[a] scope on a gun," *id.* at 249. When Newton "laughed it off," Cardwell responded, "I'm F-ing serious." *Id.*

Dr. Michael Graham, Chief Medical Examiner for the City of St. Louis, performed a postmortem examination of R.L.'s body. During the examination, Dr. Graham noticed substantial pulmonary edema fluid in R.L.'s nose and mouth. The

substance is a combination of watery fluid from the lungs mixed with air. The fluid's presence stemmed from R.L.'s death by a drug overdose that had suppressed his central nervous system and stopped his breathing. Because his heart continued to beat after he stopped breathing, his blood vessels and lungs filled with blood. As the pressure went up, part of the fluid leaked out and mixed with the air. This phenomenon is common with overdose deaths caused by drugs or substances, such as opioids, that suppress the central nervous system. This reaction explained the presence of the white, foamy substance on R.L.'s face. Dr. Graham concluded that R.L. died of an obvious overdose. He elected not to perform a full autopsy because of the "circumstances": R.L. was "found dead in a hotel room, even though [he was] local[,] ha[d] a history of substance abuse[,] and ha[d] very prominent pulmonary edema foam coming out from the nose and some in the mouth." R. Doc. 131, at 59. Dr. Graham extracted blood, urine, and vitreous fluid from R.L.'s body and forwarded those samples to the toxicology lab at St. Louis University for screening.

Laboratory Supervisor Robert Blechle screened the samples that Dr. Graham submitted. He identified and quantified the substances in R.L.'s blood as including (1) an alcohol content of 0.033 ("less than half the legal limit for a DUI"), R. Doc. 134, at 144; (2) 7-aminoclonazepam ("a metabolite of [c]lonazepam"), *id.*; (3) 224 nanograms per milliliter of amphetamine; (4) diphenhydramine (an antihistamine like Benadryl); (4) an "extremely high" and "toxic level" of 99 nanograms per milliliter of fentanyl, *id.* at 147; (5) methylphenidate (the generic name for Ritalin); (6) norfentanyl ("the primary metabolite of [f]entanyl"), *id.* at 148; (7) pregabalin ("an antiseizure medication"), *id.*; (8) propranolol (a betablocker "used to treat high blood pressure"), *id.* at 148–49; and (9) sertraline ("a very popular antidepressant"), *id.* at 149. R.L.'s urine contained evidence of 7-aminoclonazepam and monoacetylmorphine, "a metabolite of heroin." *Id*. at 154.

Dr. Sarah Riley, the Chief Forensic Toxicologist for St. Louis County, reviewed Blechle's work and R.L.'s list of prescription drugs. She determined that R.L. had the following drugs in his urine: (1) 6-monoacetylmorphine ("the definitive marker of heroin use"), R. Doc. 131, at 20; (2) 7-aminoclonazepam; (3) amphetamine; (4) diphenhydramine; (5) fentanyl; (6) methylphenidate; (7) morphine ("an opioid" and "metabolite of heroin"), *id.* at 28; (8) norfentanyl; (9) pregabalin; (10) propranolol; and (11) sertraline.

Dr. Riley also reviewed the substances found in R.L.'s blood. According to Dr. Riley, the blood used to conduct the tests was extracted from R.L.'s subclavian vein, which is considered a peripheral source of blood for testing purposes and more likely to accurately reflect the concentration of a drug at the time of death. Dr. Riley identified the substances in R.L.'s blood as including an alcohol content of 0.03, 7-amphetamine, and the other substances that Dr. Riley identified in R.L.'s urine.

Dr. Riley explained that acetyl fentanyl and fentanyl are opioids, which "are respiratory depressants." *Id.* at 23. They "are potentially toxic" and "can be very dangerous." *Id.* "[I]n an excessive amount," "[t]hey cause respiratory depression, which essentially means that the body's natural drive to breathe is turned off, which eventually leads to suffocation of breathing." *Id.*; *see also id.* at 24 (confirming acetyl fentanyl has "the same actions"). The faster fentanyl gets to the brain, the faster one can experience toxicity. Toxicity can occur within minutes to hours, depending upon how the fentanyl is ingested.

Dr. Riley opined that with a blood alcohol content of 0.03, R.L. was not legally intoxicated and would have shown "no signs or symptoms of alcohol impairment at that concentration." *Id.* at 42. She maintained that R.L. "was taking prescriptions that would account for all of the substances found in his blood and urine with the exception of the Benadryl, the [a]mphetamine, and the [f]entanyl." *Id.* at 32. The quantities of prescription drugs found in R.L.'s system were within or below

therapeutic levels, meaning R.L. was taking the medications legitimately as prescribed.

Dr. Graham consulted the toxicology report as part of his determination of R.L.'s cause of death. He learned that the level of fentanyl in R.L.'s blood was 99 nanograms per milliliter. If measured in a living patient, the normal therapeutic level of fentanyl would be around three to four nanograms per milliliter; in a deceased person, "[i]t is usually under 20" and "rarely . . . push[es] 50." *Id.* at 60. Dr. Graham opined that R.L.'s cause of death was "[a] combination of [f]entanyl and alcohol." *Id.* at 61. Both are "central nervous system depressants, . . . which act together." *Id.* at 62; *see also id.* at 64 ("Well, my opinion is that [fentanyl and alcohol] both contributed."). But Dr. Graham opined that it was "likely" that "just [f]entanyl would have killed [R.L.] on [its] own." *Id.* According to Dr. Graham, "a blood alcohol content of .03" "by itself would not have caused [R.L.] to die." *Id.* at 70.

House obtained an arrest warrant for Cardwell. Cardwell was located in a motel parking lot in a minivan with another person. The arresting officer patted down Cardwell finding Adderall pills in his pocket. Cardwell told the detectives, "That's my Adderall." R. Doc. 130, at 59. A search of the van uncovered a prescription bottle for Adderall, which had Cardwell's name and address on it.

Cardwell was charged with distributing a controlled substance resulting in R.L.'s death. The government filed a notice of intent and motion to admit evidence pursuant to Federal Rule of Evidence 404(b) "of Cardwell's prior use, possession, and distribution of fentanyl and Adderall." R. Doc. 78, at 7. The government also filed an amended criminal information and notice of enhancement pursuant to 21 U.S.C. § 851, subjecting Cardwell to a mandatory sentence of life imprisonment upon conviction. The amended criminal information and notice provided that Cardwell's prior criminal history included two state convictions for possession of a controlled substance.

The district court held a hearing on the motion to admit Rule 404(b) evidence. Following a hearing on the motion, the district court limited the introduction of Rule 404(b) evidence to Cardwell's prior use, possession, and distribution of fentanyl, Adderall, and Ritalin. The records of Cardwell's prior convictions were admitted to prove to the jury beyond a reasonable doubt that he had previously been convicted of a felony drug offense. Before the jurors heard the evidence, the district court read them a limiting instruction. The court reread the limiting instruction for the jury at the close of the evidence.

At the close of the government's evidence and again at the close of all the evidence, Cardwell moved for judgment of acquittal, arguing that there was insufficient evidence to establish that R.L. died from "solely [f]entanyl, or [f]entanyl and alcohol." R. Doc. 131, at 79. The district court denied the motions.

The jury found Cardwell guilty of distributing a controlled substance to R.L. on or about July 26, 2019. It found beyond a reasonable doubt that R.L.'s death resulted from the controlled substance that Cardwell had distributed and that Cardwell had been convicted of a prior felony drug offense before he committed the present offense. Because Cardwell was convicted of violating 21 U.S.C. § 841(b)(1)(c) in which death resulted, and because the government had filed a timely information and notice, Cardwell was subject to a mandatory minimum sentence of life imprisonment. The district court sentenced him to serve a life term.

## II. *Discussion*

On appeal, Cardwell argues that (1) the evidence was insufficient to sustain his conviction, (2) the district court erred in allowing the government to introduce evidence of Cardwell's prior drug arrests and convictions pursuant to Rule 404(b), and (3) the district court's use of Cardwell's prior drug possession conviction to enhance his sentence is unconstitutional because it punishes Cardwell more harshly than a drug distributor.

A. *Sufficiency of the Evidence*

Cardwell argues that the district court erroneously denied his motion for judgment of acquittal because insufficient evidence supported the verdict. His primary contention is that the government presented no evidence that he "provided any drug to R.L." Appellant's Br. at 26. Cardwell argues that the evidence actually showed that he did *not* have drugs to give to Newton or R.L. and that he lacked the funds to purchase drugs. Based on his view of the evidence, he maintains that "[a] more reasonable inference . . . was that R.L. went to an ATM, withdrew $500[,] and purchased drugs from someone in St. Louis City or from Newton when he came to the hotel room for ten minutes and left." *Id.* at 26–27. Cardwell additionally argues that the government presented insufficient evidence that fentanyl was the "but for" cause of R.L.'s death. *See Burrage v. United States*, 571 U.S. 204 (2014).

"We review *de novo* a district court's denial of a motion for judgment of acquittal, viewing the evidence in the light most favorable to the verdict and drawing all reasonable inferences in its favor." *United States v. Shaw*, 751 F.3d 918, 920 (8th Cir. 2014) (internal quotation marks omitted). "The jury is the final arbiter of the witnesses' credibility, and we will not disturb that assessment. As such, a jury's credibility determinations are virtually unassailable on appeal." *United States v. Keepseagle*, 30 F.4th 802, 813 (8th Cir. 2022) (internal quotation marks omitted). And "[a] conviction may be based on circumstantial as well as direct evidence. The evidence need not exclude every reasonable hypothesis except guilt. The verdict will be upheld if there is any interpretation of the evidence that could lead a reasonable jury to convict." *United States v. Seals*, 915 F.3d 1203, 1205 (8th Cir. 2019) (cleaned up).

"To convict a defendant of distribution of a controlled substance—here, fentanyl—resulting in death, the government must prove, beyond a reasonable doubt, that *the defendant* knowingly or intentionally distributed a controlled substance and that *death resulted* from the use of that drug." *United States v. Broeker*, 27 F.4th

-13-

1331, 1335–36 (8th Cir. 2022) (emphases added). Section 841(a)(1) of 21 U.S.C. makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Section "841(b)(1)(C) provides for enhanced penalties 'if death or serious bodily injury *results from* [the use of a controlled substance that has been unlawfully distributed by a defendant].'" *Seals*, 915 F.3d at 1205 (alteration in original) (emphasis added) (quoting 21 U.S.C. § 841(b)(1)(C)).

The Supreme Court has given clear guidance on the interpretation of § 841(b)(1)(C)'s causation requirement. "[B]y using the 'results from' operator in this statute, Congress deliberately chose to 'use language that imports but-for causality,' and . . . if Congress had wished for 21 U.S.C. § 841(b)(1)(C) to apply to substantial contributing factors, it would have used language denoting that concept." *Id.* at 1205–06 (quoting *Burrage*, 571 U.S. at 216). "The [g]overnment can prove the causation element in two ways: '(1) "but-for" cause, or (2) independently sufficient cause.'" *United States v. Myers*, 965 F.3d 933, 937 (8th Cir. 2020) (quoting *United States v. Lewis*, 895 F.3d 1004, 1010 (8th Cir. 2018)). As a result,

> at least where use of the drug distributed by the defendant is not an independently sufficient cause of the victim's death or serious bodily injury, a defendant cannot be liable under the penalty enhancement provision of 21 U.S.C. § 841(b)(1)(C) unless [the drug distributed by the defendant] is a but-for cause of the death or injury.

*Seals*, 915 F.3d at 1206 (alteration in original) (quoting *Burrage*, 571 U.S. at 218–19).

### 1. *Source of Drugs*

Cardwell claims that the government produced no evidence that he gave any drugs to R.L. or that R.L. took any drugs from Cardwell. We disagree. Viewing the evidence in the light most favorable to the jury's verdict and drawing all reasonable

inference in its favor, we hold that the following evidence supports the jury's finding that Cardwell distributed the drugs to R.L.:

(1) Cardwell rented Room 720 at the Hollywood Casino Hotel; (2) Newton knew Cardwell had a room at the Casino, Newton was "dope sick" and was seeking drugs from Cardwell; (3) Cardwell discussed with Newton his willingness to supply Newton with drugs; (4) Cardwell texted R.L. and told him to hurry as someone was waiting on them; (5) R.L. withdrew $500 from an ATM before meeting up with Cardwell; (6) Cardwell told Newton he was going into the City to meet with one of his drug suppliers; (7) Cardwell told Newton he was driving R.L.'s new Tahoe as his "boy Ryan" was "TKO"; (8) Cardwell told Newton that he gave his boy Ryan his "special mixing," a combination of Adderall and Roger's fentanyl; (9) Cardwell told Newton they were returning to the casino and agreed to meet with Newton to supply him with drugs; (10) Cardwell repeated to Newton that R.L. was "passed out" and that he would have to leave him in the car in order to meet Newton; (11) Cardwell swiped his VIP card as he entered the casino garage and parked R.L.'s vehicle on the VIP level; (12) Newton arrived at the hotel garage, parked, and met Cardwell and R.L. on the VIP level; (13) Newton saw Cardwell holding a bag of fentanyl capsules; (14) Cardwell, Newton[,] and R.L. walked from R.L.'s vehicle into the casino, took an elevator to the seventh floor[,] and entered Room 720; (15) R.L., who had to be awoken, was stumbling and having trouble walking; (16) Newton left the hotel room approximately ten minutes after getting capsules of fentanyl from Cardwell; (17) R.L. was already lying on the bed and not saying much; (18) Cardwell left the room in the morning and asked housekeeping not to go in the room, met up with a woman[,] and eventually went to the Ameristar Casino; (19) Cardwell left two handwritten notes in the hotel room and sent R.L. two text messages, trying to cover up the fact that he knew R.L. was already dead; (20) later in the day Cardwell was found, semi-conscious, in a bathroom stall of the Ameristar Casino with a bag of fentanyl capsules at his feet; (21) when Newton obtained more fentanyl from Cardwell, he told Newton that R.L. was dead and implored Newton to deny that there were any drugs in the hotel room; (22) Cardwell sold capsules of fentanyl to Newton on two more occasions after R.L.'s death; (23) Cardwell

-15-

threatened Newton, warning him not to speak to the police as only Newton could incriminate Cardwell about R.L.'s death; (24) when Cardwell was arrested, he was found in possession of Adderall.

Appellee's Br. at 28–30.

Caldwell's argument that R.L. "purchased drugs from someone in St. Louis City or from Newton when he came to the hotel room for ten minutes," Appellant's Br. at 26–27, amounts to mere conjecture and speculation and certainly would not compel an outcome contrary to the jury's verdict. "Sufficiency arguments based on speculation over other drug dealers[] operating 'in the same area,' or that an eyewitness 'did not actually see [the defendant] hand over drugs,' are commonly rejected, sometimes 'out of hand.'" *United States v. Simer*, 835 F. App'x 60, 66 (6th Cir. 2020) (unpublished) (second alteration in original) (quoting *United States v. Whyte*, 795 F. App'x 353, 364 (6th Cir. 2019)). Cardwell's "arguments either go to credibility concerns we cannot review or are simply speculative possibilities already rejected by the jury." *Id.*

### 2. *But-for Cause of R.L.'s Death*

The next question is whether sufficient evidence exists that the fentanyl transferred to R.L. was the "but for" cause of R.L.'s death. *See Burrage*, 571 U.S. at 218–19.

> *Burrage* . . . explains what a but-for causal relationship requires. In the usual course, it requires proof that the harm would not have occurred in the absence of—that is, *but for*—the defendant's conduct. It is textbook tort law that an action is not regarded as a cause of an event if the particular event would have occurred without it.

*United States ex rel. Cairns v. D.S. Med. LLC*, 42 F.4th 828, 834–35 (8th Cir. 2022) (cleaned up). "Causation can be proven 'if the predicate act combines with other

-16-

factors to produce the result, so long as the other factors alone would not have done so.'" *Myers*, 965 F.3d at 937–38 (quoting *Burrage*, 571 U.S. at 211).

We conclude that the record includes sufficient evidence from which the jury could have found that fentanyl was the but-for cause of R.L.'s death. *See, e.g.*, *Seals*, 915 F.3d at 1206–07 (holding conviction for distribution of heroin and fentanyl resulting in serious bodily injury was supported by sufficient evidence, including evidence that individual purchased mixture of heroin and fentanyl from the defendant, that individual immediately drove to gas station where he injected mixture in bathroom, and that the individual collapsed from overdose within seven minutes); *Broeker*, 27 F.4th at 1336 ("[A]lthough the toxicology reports disclosed the presence of multiple drugs in [the victim's] system at the time of his death, [the doctor] testified that the level of fentanyl in [the victim's] system could have, by itself, caused [the victim's] death, and [the doctor] testified that [the victim's] cause of death was fentanyl."); *United States v. Lewis*, 895 F.3d 1004, 1010 (8th Cir. 2018) ("At a minimum, the evidence established that, without the incremental effect of furanylfentanyl in the heroin, [the victim] would have lived . . . .").

Dr. Graham opined that R.L.'s cause of death was "[a] combination of [f]entanyl and alcohol." R. Doc. 131, at 61. Both are "central nervous system depressants, . . . which act together." *Id.* at 62; *see also id.* at 64 ("Well, my opinion is that [fentanyl and alcohol] both contributed."). But Dr. Graham opined that it was "likely" that "just [f]entanyl would have killed [R.L.] on [its] own." *Id.* According to Dr. Graham, "a blood alcohol content of .03" "by itself would not have caused [R.L.] to die." *Id.* at 70.

Consistent with Dr. Graham's opinion, Dr. Riley testified that acetyl fentanyl and fentanyl are opioids, which "are respiratory depressants." *Id.* at 23. They "are potentially toxic" and "can be very dangerous." *Id.* "[I]n an excessive amount," "[t]hey cause respiratory depression, which essentially means that the body's natural

drive to breathe is turned off, which eventually leads to suffocation of breathing." *Id.*; *see also id.* at 24 (confirming acetyl fentanyl has "the same actions"). The faster fentanyl gets to the brain, the faster one can experience toxicity. Toxicity can occur within minutes to hours, depending upon how the fentanyl is ingested. According to Dr. Riley, the alcohol in R.L.'s system equated to a blood alcohol content of 0.03, well below the legal limit of 0.08; because that level was subclinical, R.L. would have shown no signs or symptoms of alcohol impairment. And Blechle testified that the level of fentanyl found in R.L.'s blood—99 nanograms per milliliter—"is a toxic level" and "extremely high." R. Doc. 134, at 147.

The evidence sufficiently supports the jury's finding that Cardwell distributed fentanyl to R.L. that resulted in his death and that the fentanyl was the "but for" cause of R.L.'s death.

## B. *Rule 404(b) Evidence*

Cardwell next argues that the district court abused its discretion by permitting the government to introduce evidence of his prior arrests and convictions for possession of fentanyl and Adderall in 2015, 2016, and 2017 under Rule 404(b). Under that evidentiary rule, "evidence of another crime 'is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character'—in other words, to prove propensity to commit crimes." *United States v. Smart*, 60 F.4th 1084, 1090–91 (8th Cir. 2023) (quoting Fed. R. Evid. 404(b)). Nonetheless, the evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* at 1091 (quoting Fed. R. Evid. 404(b)). "We review the admission of evidence of prior convictions for abuse of discretion. Even if there is an error, we will not reverse a conviction if an error is harmless." *United States v. Arias*, 60 F.4th 1138, 1142 (8th Cir. 2023) (cleaned up).

We have reviewed the record. "[G]iven the overwhelming evidence supporting the jury's verdict against [Cardwell], any error in the admission of these prior convictions was harmless. Evidence of [Cardwell's] prior convictions for similar conduct did not have a substantial and injurious effect or influence in determining the jury's verdict." *Smart*, 60 F.4th at 1091 (internal quotation marks omitted). "The district court gave a limiting instruction when the evidence was introduced, telling the jury that it could only be used to show knowledge, intent, or absence of mistake, and not as evidence of guilt." *United States v. Barbee*, 44 F.4th 1152, 1156 (8th Cir. 2022).

## C. *Mandatory Life Sentence*

Finally, Cardwell argues that the district court erred in imposing a mandatory life sentence. He asserts that imposition of a life sentence violated equal protection principles because the passage of the First Step Act of 2018 unevenly amended portions of 21 U.S.C. § 841(b)(1).

The First Step Act did indeed modify § 841(b)(1)(A) and (b)(1)(B). But it did not alter the language of § 841(b)(1)(C), the crime under which Cardwell was convicted. "[Section] 841(b)(1)(C) . . . enhances penalties for 'felony drug offenses.' 'Felony drug offenses' includes offenses punishable by a term of imprisonment for more than one year." *United States v. Hixon*, No. CR 5:18-145-DCR, 2019 WL 6617398, at *4 (E.D. Ky. Dec. 5, 2019) (quoting 21 U.S.C. § 802(44)), *aff'd*, 838 F. App'x 961 (6th Cir. 2020).

Cardwell argues that the imposition of a life sentence under § 841(b)(1)(C) violates his constitutional rights because there is no rational basis[2] to punish "prior

---

[2]Cardwell has not argued that strict scrutiny applies. Instead, he asserts only that no rational basis justifies the distinction between subsections (b)(1)(A) and (B) and (b)(1)(C). Therefore, we assume without deciding that rational basis review applies.

drug users more harshly than distributors, traffickers and manufacturers." Appellant's Br. at 49. According to Cardwell, "had he instead trafficked or distributed more drugs such that his conduct fit within § 841(b)(1)(B), his prior convictions could only act as predicate offenses for enhancements if they fit the more narrow 'serious drug felony' standard." *Id.* at 49–50 Cardwell concedes that "the district court correctly followed the law." *Id.* at 50. Nonetheless, he asks this court to "rectify" the "oversight" that he claims Congress will remedy "eventually." *Id.*

"A classification that neither implicates a fundamental right nor involves a suspect class of persons is constitutional if it is supported by a rational basis." *Doe, I v. Peterson*, 43 F.4th 838, 842 (8th Cir. 2022). Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* (internal quotation marks omitted). Under rational basis review, we "must uphold a classification so long as it is rationally related to any conceivable, legitimate state purpose." *Id.*

> Here, the applicable legislative distinction pertains to two classes of individuals: (i) defendants who have been convicted of trafficking higher quantities of controlled substances under §§ 841(b)(1)(A) and (B) and are subject to a life sentence only if they have prior "serious drug felony" convictions; and (ii) defendants who have been convicted under the lower quantity threshold of § 841(b)(1)(C) and are subject to a life sentence if they have any prior convictions for "felony drug offenses."

*Hixon*, 2019 WL 6617398, at *4.

We hold that a sufficient rational basis exists for the distinction between the two classes of individuals "because it is conceivable that Congress intends harsher punishments for street-level drug traffickers who *directly* sell smaller quantities to individuals who take them and the drug use results in death." *Id.*; *see also United States v. Benjamin*, No. 19-3636-CR, 2023 WL 1097559, at *3 (2d Cir. Jan. 30, 2023)

(unpublished summary order) ("Benjamin's argument that the exclusion of defendants sentenced under § 841(b)(1)(C) from First Step Act relief violates the Equal Protection Clause fails because Benjamin has not carried his burden of negating every conceivable basis which might support that exclusion." (internal quotation marks omitted)). "[T]here is a legitimate purpose to punish street-level dealers for causing the death of street-level users." *Hixon*, 2019 WL 6617398, at *4. "Congress deliberately excluded drug sales 'resulting in death' from the First Step Act's sentencing reforms . . . ." *Whyte*, 795 F. App'x at 366 (citing *United States v. Wiseman*, 932 F.3d 411, 417 (6th Cir. 2019)). "[Section] 841(b)(1)(C) was constitutional before, nothing has changed, and it remains constitutional today." *Hixon*, 2019 WL 6617398, at *5.

## III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____